**Below is a Memorandum Decision of the Court.**



**Marc Barreca**
**U.S. Bankruptcy Court Judge**
(Dated as of Entered on Docket date above)

_____

—

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

In re:

**Michael Paul Foster and Juryleen Marzan Foster,**

Debtor

Case No. 16-12802-MLB

**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING EVIDENTIARY HEARING**

## INTRODUCTION

The United States Trustee ("**U.S. Trustee**") has filed an Amended Motion for Examination of Fee, Disgorgement, and Civil Penalty, seeking an order requiring UpRight Law (defined below), and Jared D. Bellum ("**Mr. Bellum**") to refund some or all of the fees that the debtors, Michael Paul Foster and Juryleen Marzan Foster (the "**Fosters**"), paid to UpRight in Fair Debt Collection Practices Act (the "**FDCPA**") litigation, and imposing sanctions, a civil penalty, and injunctive relief against UpRight and Mr. Bellum (the "**Motion**").[1] This matter came before me for an evidentiary hearing on December 14,

---

[1] The U.S. Trustee requested an "order requiring UpRight Law and Bellum to comply with LBR 5005-1(d)(2) in all future cases filed in this District, disgorge $1,962 pursuant to § 329; pay a civil penalty pursuant to § 526(c)(5) in the amount of $23,400; pay sanctions pursuant to § 707(b)(4) and Rule 9011

1

2017. The U.S. Trustee was represented by Carole Ryczek and Sarah Flynn. UpRight Law and Mr. Bellum were represented by Craig B. Sonnenschein and James Leighton O'Connell-Miller. At the conclusion of the hearing, I took the matter under advisement and requested further briefing.

I have considered the testimony presented at the evidentiary hearing, the exhibits admitted into evidence, the briefing,[2] and the arguments of counsel. Being fully advised, I make the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.[3] In short, I find that Mr. Bellum and UpRight Law violated, *inter alia*, 11 U.S.C. §§ 526 and 707(b)(4), Fed. R. Bankr. P. 9011(b) ("**Rule 9011(b)**"), and Local Rules W.D. Wash. Bankr. 5005-1(d) ("**LBR 5005-1(d)**") in the Fosters' case and other cases, but that these violations do not warrant sanctions given the voluntary disgorgement of bankruptcy fees which has already occurred and other factors.

## JURISDICTION

I have jurisdiction over this adversary proceeding and the parties pursuant to 28 U.S.C. §§ 157(a) and 1334, and Local Rule 87(a). Venue is proper pursuant to 28 U.S.C. §§ 1408(1) and 1409(a).

## FINDINGS OF FACT

UpRight Law

1. Jason Allen Law LLC is a trade name of Law Solutions Chicago LLC, an Illinois limited liability company. (Amended Joint Prehearing Order: Admitted Facts ("**Prehearing Order**") ¶ 1.) Law Solutions Chicago filed articles of organization with the Illinois Secretary of State on October 10, 2008,

---

in the amount of $1,650; and pay sanctions pursuant to the Court's inherent authority to enforce LBR 5005-1(d)(2) in the amount of $1,400; and providing such other relief as is just and proper." *See* Dkt. No. 132.

[2] I considered all of the relevant briefing including, but not limited to, the original briefing and the supplemental briefing submitted after the deadlines set forth in my letter requesting further briefing and the Order Granting Respondents' Motion for Extension of Time to File Final Brief. *See* Dkt. Nos. 158 and 172. Although certain briefing from both parties was late (*see* Dkt. Nos. 168 and 173), I conclude that the late submissions are appropriate under the circumstances, and I will consider both submissions.
[3] To the extent findings of fact are characterized as conclusions of law, or vice versa, they should be construed as though recited in their appropriate respective sections.

and is authorized to transact business in Illinois under the following active assumed names: Jason Allen Law LLC; Allen Chern Law; UpRight Law LLC; and Allen & Associates, LLC (collectively, "**UpRight Law**"). (*Id.* at ¶ 2.)

2. Law Solutions Chicago LLC is registered as a foreign limited liability company in the State of Washington. (*Id.* at ¶ 3.)

3. UpRight Law is a debt relief agency, as that term is defined in 11 U.S.C. § 101(12A). (Id. at ¶ 4.)

4. UpRight Law represents clients in all 50 states. (Transcript of Dec. 14, 2017 Hearing ("Tr.") 166:16-20.) UpRight Law began representing clients in the Western District of Washington in 2014. (*Id.* at 192:22-25.) Between 2014 and December 2017, UpRight Law filed almost 21,000 bankruptcy petitions nationally, and approximately 367 bankruptcy petitions in the Western District of Washington. (*Id.* at 192:16- 193:5.)

5. UpRight Law advertises to the public at www.UpRightlaw.com. (Prehearing Order ¶ 7.) Starting as early as September 27, 2014, and until at least January 23, 2017, UpRight Law's website included the following statements:

> UpRight Law takes a holistic approach to debt. Many firms focus entirely on bankruptcy and consider their work done when the bankruptcy discharge is entered. Our goal is to help you make a long– term change that will improve your finances and your life. We'll invest in finding the right solution for you, prosecuting violations of consumer protection laws, getting you a fresh financial start and then protecting that new beginning by monitoring your credit report and fighting creditors and debt collectors who aren't following the rules.

(*Id.* at ¶ 8.)

6. UpRight Litigation LLC ("**UpRight Litigation**")[4] is a majority owned subsidiary of UpRight Law LLC. (Tr. 168:19-22.) UpRight Litigation, in coordination with UpRight Law LLC, represented clients of UpRight Law LLC in consumer protection actions, including lawsuits filed under the FDCPA. (*Id*. at 168:22–23.) Specifically, UpRight Law would refer consumer protection claims to UpRight Litigation, and UpRight Litigation would execute a legal services agreement with the client. (*Id*. at 169:1–4.)

7. UpRight Law advertised UpRight Litigation's services to bankruptcy attorneys in the 2015 summer issue of the Consumer Bankruptcy Journal in an attempt to generate referrals from bankruptcy practitioners to UpRight Litigation. (*Id.* at 169:8-10; 171:12-18.) The advertisement described UpRight Law as a "Nationwide Consumer Protection and Bankruptcy Litigation Law Firm," and included the statement, "Accelerate payment of your bankruptcy fees by applying client's proceeds of FDCPA settlements." (Ex. P1.)

8. During the December 14 hearing, Kevin Chern ("**Mr. Chern**"), the managing partner of UpRight Law, testified that during client intake calls, UpRight Law employees may have told prospective clients that an advantage of hiring UpRight Law was that, in addition to handling their bankruptcy cases, UpRight Law would make sure that they were free from harassment and other abusive creditor practices. (*Id.* at 172:16–23.)

Mr. Bellum

9. Mr. Bellum is a Washington-licensed attorney. (*Id.* at 128:1-3.) He became licensed to practice in Washington in 2010 and was admitted to practice in the Western District of Washington that same year. (*Id*.) Mr. Bellum has never been disciplined by the disciplinary authorities in the State of

---

[4] Although some of the findings herein relate to UpRight Litigation separately from UpRight Law, no party appears to argue that UpRight Litigation's separate legal existence from UpRight Law is relevant to any of the issues in this case.

Washington or disciplined or sanctioned by the courts of the Western District of Washington. (*Id*. at 128:6-11.)

10. Mr. Bellum became a partner of UpRight Law in August of 2015. (Prehearing Order ¶ 12.) At the time he became a partner of UpRight Law, he had been practicing bankruptcy law for approximately 5 years. (Tr. 129:2-4.) During the time period before he joined UpRight Law, he filed between 90 and 100 bankruptcy petitions. (*Id*. at 129:5-8.) He was not the subject of a motion for sanctions relating to any of those cases. (*Id*. at 129:9-11.) Mr. Bellum continued to operate his own law practice after joining UpRight Law. (*Id*. at 128:24-129:1.)

11. During his time as a partner of UpRight Law, Mr. Bellum filed between 90 and 100 bankruptcy petitions in his capacity as a partner of UpRight Law. (*Id*. at 132:2-8.) He filed all of those petitions between August 2015 and October 2016. (*See id.* at 131:19-132:1.) He has not filed any bankruptcy petitions in his capacity as a partner of UpRight Law since October 2016. (*Id*. at 131:25-132:1.)

12. Mr. Bellum moved to Rhode Island in May 2017. (*Id*. at 126:21-23; Prehearing Order ¶ 95.) Other than continuing to have an appearance in this case, and four related cases, Mr. Bellum has not practiced bankruptcy law since he moved to Rhode Island. (Tr. 130:9-13; Prehearing Order ¶ 95.) Mr. Bellum concluded his individual law practice before he moved to Rhode Island, and he has not filed any bankruptcy petitions at all since March 2017. (Tr. 130:13-18; 130:22-131:3.)

13. Mr. Bellum has no plans to continue to practice consumer bankruptcy law. (*Id*. at 131:12-14.) As soon as the cases involving the Fosters, and the four clients impacted by related motions, are resolved, Mr. Bellum intends to resign from UpRight Law. (*Id*. at 131:15-18.)

**Below is a Memorandum Decision of the Court.**

<u>The Fosters' Initial Contacts with UpRight Law Regarding Potential Bankruptcy Relief</u>

14. The Fosters are assisted persons, as that term is defined in 11 U.S.C. § 101(3). (Prehearing Order ¶ 15.)

15. On June 22, 2015, the Fosters contacted UpRight Law regarding their desire to file for bankruptcy relief. (*Id*. at ¶ 16.) Prior to contacting UpRight Law, the Fosters had been contacted by collection agencies and creditors attempting to collect debts. (Tr. 36:25–37:1–2.) On the same day, June 22, 2015, the Fosters decided to hire UpRight Law. They made an initial $100 payment toward their bankruptcy attorneys' fees, and arranged to pay the balance of their bankruptcy fees in installments. (Prehearing Order ¶ 17 - ¶ 18.) UpRight Law initially assigned Thomas McAvity ("**Mr. McAvity**") to represent the Fosters in bankruptcy. (Ex. P30-24.)

16. Also on June 22, 2015, the Fosters executed an Attorney Client Base Retainer Agreement for Chapter 7 Bankruptcy Related Services (the "**Retainer Agreement**"). In paragraph 9 of the Retainer Agreement, the Fosters authorized UpRight Law to investigate the "existence of violations of the automatic stay, the discharge injunction, or for breach of any state/federal consumer protection statutes or bankruptcy code violations, and to prosecute them with or with the assistance [*sic*] designated counsel as Firm deems necessary to pursue such claims." (*Id*.; Prehearing Order ¶ 34.)

17. UpRight Law advised the Fosters to report any creditor calls to UpRight Law, and provided them with the contact information to use when reporting such calls. (Tr. 37:15–19.)

18. After the Fosters hired UpRight Law in June 2015, they continued to receive calls from collection agencies and creditors. (*Id.* at 37:7–13.)

19. On or around June 30, 2015, the Fosters received a call from a collection agency, Northland Group, LLC ("**Northland**"). (*Id.* at 41:8–9.) The Fosters advised Northland that they were represented

by UpRight Law. (*Id*. at 41:16–18.) On July 2, 2015, Northland called the Fosters again. (*Id*. at 41:19–20.)

20. On July 2, 2015, Andrew Hall ("**Mr. Hall**"), a legal assistant at UpRight Law, advised Ms. Foster that UpRight Law's consumer rights department provided services intended to help the Fosters "get some extra money to pay off your bankruptcy." (Prehearing Order ¶ 20.)

<u>The Fosters' FDCPA Litigation</u>

21. Also on July 2, 2015, the Fosters executed a Consumer Rights Attorney/Client Agreement with "UpRight Litigation LLC, UpRight Law LLC, and/or one of its affiliated law firms." (*Id*. at ¶ 22; Ex. P4-3.)

22. The Consumer Rights Attorney/Client Agreement explained that the firm would advance all expenses associated with representation, that the client would not be required to reimburse the firm in the event that the representation was not successful, and that any such expenses would be deducted from any recovery before calculating the client's share. (*See* Ex. P4 at 2.)

23. The Consumer Rights Attorney/Client Agreement provided that:

> Lawyers and legal fees can be expensive. So that you are provided access to the legal system at no out–of–pocket cost to you, we have agreed to enter into the following fee arrangement. In the event of a settlement or judgment entered on your behalf, we agree that your portion of the recovery will be calculated as follows:
>
> ☐ $250 of the first $2,000 of the Recovery
> ☐ Plus 20% of any portion of the Recovery between $2,001–$5,000
> ☐ Plus 30% of any portion of the Recovery between $5,001–$10,000
> ☐ Plus 40% of any portion of the Recovery between $10,001–$25,000
> ☐ Plus 50% of any portion of the Recovery in excess of $25,000
> ☐ If you lose your case, you will not owe us anything for our attorneys' fees.

(Prehearing Order ¶ 23; Ex. P4-1.)

7

24. The Consumer Right Attorney/Client Agreement further provided that:

> The balance of the recovery after deducting your portion as set forth above shall constitute our attorneys' fees. This Agreement takes into account that we may have to spend a significant amount of time to recover a relatively small amount of money for you. As a result, our fees may be significantly greater than your portion of the recovery. If we were not allowed to be fairly compensated for our time in working on consumer protection cases, we may not have been willing to do this sort of work and you might be defenseless against the tactics of large unscrupulous businesses. Keep in mind that the primary goal of our representation is to stop the collection harassment and abuses, with cash compensation being a possible secondary benefit.

(Prehearing Order ¶ 24; Ex. P4-1.)

25. At the time the Fosters signed the Consumer Rights Attorney/Client Agreement with UpRight Litigation and UpRight Law, they were still making installment payments of their bankruptcy fees to UpRight Law. (Tr. 39:3–25, 40:1.)

26. On July 24, 2015, UpRight Law initiated a lawsuit on behalf of the Fosters in the United States District Court for the Western District of Washington against Northland for Northland's alleged violation of the FDCPA. (Prehearing Order ¶ 25; Ex. P3.) The Fosters were represented in the FDCPA lawsuit by Mr. McAvity in his capacity as a partner of UpRight Law. (*Id.* at ¶ 26; Ex. P3-5.)

27. The Fosters' motivation for filing the FDCPA lawsuit included stopping unlawful collection activity from the Northland Group. (Tr. 49:21-50:6.) As Ms. Foster explained, she filed suit because "they kept calling me despite the fact that I already told them I had a lawyer. And then it was just – caused me a lot of grief that they were calling me at work." (*Id.*) Ms. Foster testified that the harassment "caused me stress. I couldn't sleep. I couldn't eat." (*Id.*)

28. At the time the Fosters filed their FDCPA lawsuit, they were still planning to file for bankruptcy. (*Id.*at 44:2–4.)

29. The Fosters intended to apply some or all of their recovery from the FDCPA lawsuit they filed against Northland to pay the bankruptcy fees they owed UpRight Law. (*Id.* at 42:11– 13.)

30. UpRight Law's bankruptcy representation of the Fosters was an element of a claim in their FDCPA lawsuit against Northland. In particular, the Fosters' FDCPA complaint contained a count alleging that Northland had violated the FDCPA by continuing to contact the Fosters after they had advised Northland that UpRight Law represented them in connection with the debt that Northland was attempting to collect. (Ex. P3.)

31. In late October 2015, the Fosters and Northland agreed to settle the Fosters' FDCPA claim. (Prehearing Order ¶ 27; Ex. P3-5.) On January 8, 2016, the Fosters signed a settlement agreement concerning their claim against Northland. (Prehearing Order ¶ 28; Ex. P31-4.) The agreement provided that Northland was to pay $2,750 to resolve the Fosters' FDCPA claim. (Prehearing Order ¶ 28; Ex. P31-1.) On January 21, 2016, Northland issued a check for the settlement proceeds, made out to UpRight Litigation, in the amount of $2,750. (Prehearing Order ¶ 30.)

32. On February 8, 2016, the United States District Court for the Western District of Washington entered a stipulated judgment dismissing the Fosters' lawsuit against Northland. (Ex. P41). The judgment provides that, based on the parties' stipulation, the Fosters' claims were dismissed with prejudice and without attorneys' fees or costs to either party. (*Id.*; Tr. 184:14–21.)

33. UpRight Litigation's attorney's fees and costs for representing the Fosters in the lawsuit against Northland were paid from the settlement proceeds, according to the terms of the Consumer Rights Attorney/Client Agreement. (Prehearing Order ¶ 30; Ex. P4.)

34. On February 9, 2016, UpRight Law transferred $303 of the settlement proceeds to the Fosters. (Prehearing Order ¶ 31.) UpRight Law retained the balance of the settlement proceeds, representing attorneys' fees of $1,962 and costs of $485. (*Id.*)

**Below is a Memorandum Decision of the Court.**

<u>Transfer of the Fosters' Bankruptcy File to Mr. Bellum</u>

35. On or around August 21, 2015, UpRight Law changed the attorney assigned to the Fosters' bankruptcy file from Mr. McAvity to Mr. Bellum. (*Id*. at ¶ 32.)

36. The Fosters made installment payments toward their bankruptcy attorney's fees and costs for a period of months, and had paid them in full by December 28, 2015. (*Id.* at ¶ 18.)

37. The Fosters did not actually apply any of their recovery from the FDCPA lawsuit toward their bankruptcy fees. (Tr: 162:23-163:1.)

38. On or about December 28, 2015, a member of UpRight Law's Chicago staff notified Mr. Bellum via email that the Fosters had paid their bankruptcy attorney's fees in full. (Prehearing Order ¶ 33.) The December 28 "handoff" email to Mr. Bellum made no mention of the Fosters' FDCPA case, the settlement of the case, the settlement funds the Fosters received, or the attorney's fees that UpRight Law received in the FDCPA litigation. (*Id*.)

39. On January 4, 2016, David Levin ("**Mr. Levin**"), the head of the consumer litigation department at UpRight Law, emailed Mr. Bellum and informed him that the Fosters would receive $303 in settlement of their FDCPA case against Northland. (*Id*. at ¶ 35.) The email from Mr. Levin to Mr. Bellum further stated, "The case was settled 2 months ago and I expected that they would have their money by now. The idea was to apply it to the balance of their bankruptcy fees." (*Id*.)

40. Upright Law's internal Salesforce record for the Fosters contained a "red flag," indicating that there was something needing extra attention from the partner. (Tr. 138:18-20; Ex P30-12).[5]

---

[5] Since approximately February 2015, UpRight Law has utilized a customer relationship management system built on a Salesforce platform to hold client information, record case-file related events, and organize its clients' files. (Prehearing Order at ¶ 6.) The general purpose of a "red flag" in the Salesforce database is to let a Partner know that there is something about a bankruptcy case that requires extra attention. (Tr. 138:21-25).

41. The Salesforce red flag had the name "FDCPA settlement" and a note stating "FDCPA case settled 10/30/2015. We should have payment by now. Defendant is stalling. Contact David Levin for details." (Prehearing Order ¶ 36.) The Salesforce records do not indicate when this entry was made. (*Id*.)

The Fosters' Bankruptcy

42. On May 25, 2016, Mr. Bellum, in his capacity as a partner with UpRight Law, filed a chapter 7 petition on behalf of the Fosters, initiating Case No. 16–12802. (*Id.* at ¶ 37.)

43. Mr. Bellum sent the Fosters a questionnaire before preparing their bankruptcy petition. (Ex. P30 at 9.) On or about January 13, 2016, Mr. Bellum sent the Fosters a copy of the petition with questions, and then he called to follow up with them that day to assure they had received it. (Ex. P30 at 9). Ms. Foster testified at the evidentiary hearing that she reviewed the petition, schedules, and SOFA and then she and Mr. Foster reviewed them line by line with Mr. Bellum over the phone. (Tr. 50:7-16.)

44. In response to item no. 35 of Schedule A/B, the Fosters disclosed a "Settlement from FDCPA claim settled by UpRight. Fosters received $303 in settlement of their claims." (Prehearing Order ¶ 43.) In response to item no. 2 of Schedule C, the Fosters exempted $303 under 11 U.S.C. § 522(d)(5) and referenced "Line from Schedule A/B 35.1[,]". (*Id*. at ¶ 44.) At the time Mr. Bellum was preparing the Fosters' bankruptcy documents, he knew that the FDCPA claim had been settled prepetition (Tr. 119:22-25), but he did not investigate further to get additional information about the claim. (Tr. 119:22–25.) In his testimony at the December 14 hearing, he admitted that he should have inquired further regarding the FDCPA claim. (*Id*. at 120:1–2.)

45. Two portions of the bankruptcy documents which Mr. Bellum filed on behalf of the Fosters had been prepared by UpRight Law staff at the Chicago office: the Disclosure of Compensation of Attorney for Debtor(s) (also known as a "**Form 2030**"), and the response to question number 16 on the statement of financial affairs (the "**SOFA**"), which asks, "Within 1 year before you filed for bankruptcy,

11

did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?" (Prehearing Order ¶¶ 39, 42.)

The Fosters' Initial SOFA

46. The Fosters' FDCPA lawsuit, settlement of the lawsuit, and payment of $2,447 in settlement proceeds to UpRight Law was not disclosed anywhere in the SOFA that UpRight Law and Mr. Bellum filed in the Fosters' case on May 25, 2016 (the "**Initial SOFA**"). (*Id.* at ¶ 45.)

47. Ms. Foster testified at the December 14 hearing that she did not know why the FDCPA lawsuit was not disclosed on the Initial SOFA, and that she would have disclosed the lawsuit to Mr. Bellum if she had been asked about it. (Tr. 46:3–12.)

48. UpRight Law and Mr. Bellum agree that the FDCPA lawsuit should have been included on the Initial SOFA at Question No. 9 (*Id.* at 173:10-13), and that the $303 that the Fosters received should have been included in response to Question No. 5. (*See id.* at 187:21-188:1.)

49. Virginia Burdette ("**Ms. Burdette**"), the chapter 7 trustee in the Fosters' bankruptcy case, testified that she relies on debtors understanding the questions on the bankruptcy schedules and SOFA and answering them accurately, as well as on debtors' attorneys "to basically endorse everything they know is in the schedules and that they are true, accurate, and complete." (Burdette Dep. 7:11-14; 31:6-32:4.)

50. Ms. Burdette further testified that although she did not deem significant the $303 FDCPA recovery that the Fosters listed on their Schedule A/B, she would have felt differently had she known that the full amount of the settlement was closer to $3,000. (*Id.* at 32:5–10.) Ms. Burdette testified that if she had known the full amount, she would have asked for more information. (*Id.* at 32:5–16.)

12

The Fosters' Initial Form 2030

51. On the initial Disclosure of Compensation of Attorney for Debtor(s) filed with the petition (the "**Initial Foster Form 2030**"), Mr. Bellum certified that he, as an UpRight Law partner, received $1,650 in legal fees paid "in contemplation of or in connection with the bankruptcy case," plus $335 for the filing fee. (Prehearing Order ¶ 38.) Mr. Bellum and UpRight Law did not disclose UpRight Law's receipt of $2,447 of proceeds from the settlement of the Fosters' FDCPA claim on the Initial Foster Form 2030. (*Id*. at ¶ 41.)

52. The Initial Foster Form 2030 states in paragraph 7 that "[b]y agreement with the debtor(s), the above-disclosed fee does not include the following services: Representation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding." (*Id*. at ¶ 40.) No other legal services are excluded from the scope of representation. (*Id*.)

Amendments to the Fosters' Bankruptcy Filings

53. Mr. Bellum made three sets of amendments to the Fosters' bankruptcy filings over the course of their bankruptcy to date. (Tr. 141:10-12.)

54. On July 13, 2016, the Fosters filed an amendment to the Initial SOFA, disclosing a $2,100 payment to a friend in response to question no. 6 (the "**First Amended SOFA**"). (Prehearing Order ¶ 46.) The Fosters made no other amendments to the SOFA or their bankruptcy schedules. (*Id*.) Ms. Burdette requested that Mr. Bellum make that amendment after the meeting of creditors. (Tr. 142:22-24.)

55. The Fosters' FDCPA lawsuit, settlement of the lawsuit, and payment of $2,447 in settlement proceeds to UpRight Law were not disclosed anywhere in the First Amended SOFA. (*Id*. at ¶ 47.)

56. On November 10, 2016, Mr. Bellum filed an amended Disclosure of Compensation of Attorney for Debtor(s) (the "**Amended Foster Form 2030**"). (Prehearing Order ¶ 50.) Mr. Bellum and

13

UpRight Law did not disclose UpRight Law's receipt of $2,447 in proceeds from the settlement of the Fosters' FDCPA claim on the Amended Foster Form 2030. (*Id*. at ¶ 51.)

57. Along with the Amended Foster Form 2030, Mr. Bellum filed a copy of the Attorney Client Base Retainer Agreement for Chapter 7 Bankruptcy Related Services the Fosters executed with UpRight Law. The Agreement contains a longer list of unbundled services (i.e. services excluded from those covered by the flat fee for the bankruptcy engagement) than the exclusions that Mr. Bellum and UpRight Law disclosed in the Initial Foster Form 2030. (*Id*. at ¶ 52.)

58. On December 7, 2016, the Fosters filed a second amended SOFA (the "**Second Amended SOFA**"), in which the Fosters disclosed the FDCPA lawsuit in response to SOFA 9, their receipt of $303 in settlement proceeds from the FDCPA Lawsuit, and the full settlement value of $2,750. (*Id*. at ¶ 48.) UpRight Law's receipt of $2,447 of proceeds from the settlement of the Fosters' FDCPA claim was not disclosed in the Second Amended SOFA. (*Id*. at ¶ 49.)

59. Mr. Bellum filed the Amended Foster Form 2030 after reflecting on Judge Lynch's rulings in the *Vanderhoof,* 16-40619-BDL, *Perlee*, 16-42859-BDL, and *Owen*, 16-43235-BDL cases. (Tr. 143:11-23; Ex. P9.)

60. In motions that the U.S. Trustee filed in *In re Vanderhoof*, *In re Perlee*, and *In re Owen*, the U.S. Trustee sought penalties under 11 U.S.C. § 526(c)(5) for the same improper "unbundling disclosure" allegations in this case based on the same 20 cases that the U.S. Trustee identifies in the Motion.

61. Specifically, the U.S. Trustee argued in *Vanderhoof, Perlee, and Owen*:

> As previously discussed, [the] Disclosure of Compensation filed by Mr. Bellum contains statements that are untrue and misleading, and which Mr. Bellum knew or should have known were untrue or misleading. In addition to filing the misleading statement in the Debtor's case, Mr. Bellum has engaged in a clear and consistent pattern of filing false and misleading disclosures of compensation in the Other UpRight Cases. Mr.

14

Bellum's conduct is therefore subject to sanction under either prong of § 526(c)(5).

*In re Perlee,* 3:16-bk-42859-BDL, Dkt. No. 10 at 10; *In re Owen*, 3:16-bk-43235-BDL, Dkt. No. 8 at 10; *In re Vanderhoof*, 3:16-bk-40619-BDL, Dkt. No. 21 at 11.

62. The Motion in *Foster* similarly defines the "Other UpRight Cases**"** to "include": *Stacy LeAnn Stalter,* 16-40099-PBS; *Ofelia Ygonia Mann*, 16-40135-PBS; *Michael Joel Waters*, 16-40494-BDL; *Liesilottie Maria Smith* 16-40595-BDL; *Ashley Marie Lee,*16-40979-BDL; *Jay Christopher Rosenow,* 16-41189-BDL; *Brent AnsonVasboe*, 16-41256-PBS; *Rachel Elizabeth Stum,*16-41276-BDL; *Denise Bonita Crump*, 16-41562-BDL; *Kaye Brozina,* 16-42266-PBS; *Robert Clarence Santos and Rhonda Sue Santos*, 16-12835-MLB; *Christopher David Pinney and Becky Jane Pinney*, 16-13003-CMA; *Janice Diana Hallstrom*, 16-42427-PBS; *Ivan Hampton*, 16- 13126-MLB; *Brenda Cameron,* 16-13124- MLB; *Michael Ellis Hankins*, 16-13445-CMA; *Helen Amada Darling*, 16-42908-BDL; *Robert James Vanderhoof and Stacey Ann Vanderhoof*, 16- 40619; *Penny Irene Perlee*, 16-42859-BDL; and *Jesse Dean Owen*, 16-43235-BDL. (Am. Mot. By United States Trustee at p. 9, n.7., ECF No. 60.)

63. Following the November 8, 2016 hearing, Judge Lynch found "no intent on the part of Mr. Bellum or UpRight Law sufficient to impose a penalty under 11 U.S.C. § 526; and, the Court does not find a clear and consistent pattern or practice of violating 11 U.S.C. § 526 to impose a civil penalty since this is the first time these issues have been brought to the Court's attention." (*In re Perlee,* 3:16-bk-42859-BDL, Dkt. No. 36; *In re Owen*, 3:16-bk-43235-BDL, Dkt. No. 26; *In re Vanderhoof*, 3:16-bk-40619-BDL, Dkt. No. 51.)

UpRight Law's Policy Regarding Claim Scheduling

64. By October or November 2016, UpRight Law concluded that its existing policies were not adequate to ensure that the lawsuits it filed on behalf of its debtor-clients within a year of the petition date were disclosed in the bankruptcy documents. (Tr. 208:18–24, 209:12–23.) To ensure that FDCPA

lawsuits were disclosed on clients' bankruptcy documents, UpRight Law established a policy for scheduling potential claims. (Tr. 209:23–24, 210:2–4, 210:7–9.) Under this policy, UpRight Law's Consumer Protection Claims Department was to enter information about any lawsuit that UpRight Law was handling for the clients directly into UpRight Law's document preparation software, Best Case Bankruptcy, so that the clients' bankruptcy schedules and statements would include information about the lawsuit when UpRight Law's Chicago staff handed off the case to the local partner. (*Id*. at 210:9–25.) Prior to implementation of this policy, UpRight Law's Chicago staff completed only three portions of a debtor's bankruptcy documents: basic information about the debtor(s) on the petition; Form 2030; and SOFA question number 16. (*Id*. at 211:8–17.) The local partner completed all other portions of a debtor's bankruptcy petition, schedules, and statements. (*Id*. at 211:17–23.)

UpRight Signature Policy

65. UpRight Law provided Mr. Bellum with a copy of its Partner Handbook at or around the time he joined UpRight Law as a partner in August of 2015. (Prehearing Order ¶ 13.) Although UpRight Law has revised the Partner Handbook several times, at all relevant times the Handbook advised:

> Always have the client sign duplicate original signature pages and mail the duplicates to Chicago (*see below*) at least once a month so that we can retain an original set in Chicago in case there's ever a regulatory inquiry.
>
> UpRight Law
> Attn: Documents
> 79 W. Monroe Street
> 5th Floor
> Chicago, IL 60603.

(*Id*.at ¶ 14; Ex. P28-11.)

66. Notwithstanding the stated policy in the Partner Handbook, UpRight Law did not require its partners, including Mr. Bellum, to send duplicate original signature pages to the Chicago office. (Tr. 99:4–9, 213:9–18.)

16

67. Mr. Chern testified that he received pushback relating to this policy because of the burden and expense of having to mail in the actual handwritten signatures on a monthly basis. (*Id.* at 213:11-13.) Because it was not apparent to Mr. Chern that the firm was experiencing an issue with partners not obtaining handwritten signatures in violation of the firm's policy, he acquiesced to the requests of partners to not have to mail those to the Chicago office. (*Id.* at 213:13-18.)

68. In May 2017, UpRight Law implemented a signature audit policy to ensure that the firm's Partners obtain handwritten signatures, irrespective of what their local jurisdictions' rules require. (*Id.* at 213:19-215:15; Ex. R50.)

Mr. Bellum's Practices Regarding Original Signatures

69. Before late May 2016, Mr. Bellum did not consistently obtain handwritten signatures from bankruptcy clients on their petitions, including in his own law practice. (Tr. 147:2- 10.) Mr. Bellum did, however, attempt to ensure that his clients verified the information contained in their petitions before he filed them. (*Id.* at 149:16-150:1.)

70. Mr. Bellum changed his practices relating to handwritten signatures following a Continuing Legal Education ("CLE") course he attended in San Francisco, California in late May 2016, after which time he began to obtain handwritten signatures. (*Id.* at 147:21-148:7.)

71. At the time Mr. Bellum filed the Fosters bankruptcy petition, he requested that they provide their handwritten signatures. (*Id.* at 150:7-11.) Mr. Bellum believes that the Fosters provided their handwritten signatures, but he could not locate them when he was later requested to provide them. (*Id.* at 150:13-14.) I find his testimony to be credible. Ms. Foster testified that she believed she had handsigned the initial petition before it was filed, and that she had mailed it to Mr. Bellum. (*Id.* at 50:17-22.) I find her testimony to be credible.

72. Nevertheless, neither Mr. Bellum nor UpRight Law possesses the Fosters' original, "blue ink" signatures, or copies of their original, "blue ink" signatures created prior to the filing of the Fosters' (a) petition, bankruptcy schedules, and Initial SOFA filed on May 25, 2016, at ECF no. 1; (b) chapter 7 statement of current monthly income, filed on May 25, 2016, at ECF no. 2; or (c) declaration about individual debtors' schedules, filed on July 13, 2016, at ECF no. 10. (Prehearing Order ¶ 54.)

Other Cases

73. In addition to the Fosters' case, from January 13, 2016, to September 8, 2016, Mr. Bellum filed twenty cases in his capacity as a partner with UpRight Law. (*Id*. at ¶ 57.) Each of the debtors in these cases was an assisted person as that term is defined in 11 U.S.C. § 101(3). (*Id*. at ¶ 58.)

74. The Form 2030s Mr. Bellum filed in each of the cases he filed in his capacity as a partner with UpRight Law from January 13, 2016, to September 8, 2016, contained the same statement concerning limitations on legal services, namely that "[b]y agreement with the debtor(s), the above-disclosed fee does not include the following services: Representation of the debtors in any dischargeability actions, judicial lien avoidances, relief from stay actions or any other adversary proceeding." (*Id*. at ¶ 59.) However, the retainer agreements executed by UpRight Law and the debtors in these cases included a longer list of legal services excluded from UpRight Law's base fee, including: motions to redeem personal property; bankruptcy rule 2004 examinations; motions to avoid liens/judgments, contested matters or adversary proceedings; contested matters regarding exemptions; amendments to any list, schedule, statement, and/or document; motions to continue the § 341 hearing; motions or adversary complaints to abandon/refinance/sell/purchase property; assistance carrying out the Debtor's Statement of Intentions; monitoring an asset case; reaffirmation agreements; and re-opening a bankruptcy case to submit post-filing proof of pre-discharge counseling. (Ex. P40.) None of these exclusions were disclosed on Mr. Bellum's initial Form 2030s. (Prehearing Order ¶ 59.)

75. In response to Judge Lynch's decision in *In re Vanderhoof, In re Owen*, and *In re Perlee*, Mr. Bellum filed amended Forms 2030s in each of the open cases he filed in his capacity as a partner with UpRight Law, in order to accurately disclose the services excluded from the base fee. (Tr. 120:22–25, 121:1–3.)

76. Mr. Bellum has not filed any new bankruptcy petitions in his capacity as a partner of UpRight Law after Judge Lynch's November 2016 oral ruling. (*Id.* at 131:8-11.)

77. Specifically, Mr. Bellum, in his capacity as a partner with UpRight Law, represented the debtors in *In re Stalter*, 16-40099–MJH, *In re Mellott*, 16-43236–MJH, *In re Keating*, 15-45278–MJH, and *In re Jones*, 15-45525–BDL, in their chapter 7 bankruptcy cases (collectively, the "**Similar Cases**"). (Prehearing Order ¶ 64.)

78. Each of the debtors in the Similar Cases is an assisted person, as that term is defined in 11 U.S.C. § 101(3). (*Id.* at ¶ 65.)

79. Each of the debtors in the Similar Cases contacted UpRight Law seeking representation in bankruptcy. (*Id.* at ¶ 66.) UpRight Law initially assigned Mr. McAvity to represent the debtors in the Similar Cases in bankruptcy, but later reassigned each of their bankruptcy cases to Mr. Bellum. (*Id.* at ¶ 67.)

80. Each of the debtors in the Similar Cases executed an Attorney Client Base Retainer Agreement for Chapter 7 Bankruptcy Related Services with UpRight Law, which authorized UpRight Law to investigate the "existence of violations of the automatic stay, the discharge injunction, or for breach of any state/federal consumer protection statutes or bankruptcy code violations, and to prosecute them with or with the assistance [sic] designated counsel as Firm deems necessary to pursue such claims." (*Id.* at ¶ 68.)

81. Each of the debtors in the Similar Cases executed a Consumer Rights Attorney/Client Agreement, hiring UpRight Litigation LLC, UpRight Law LLC, and/or one of its affiliated law firms to represent him/her in any potential claims against his/her creditors, debt collectors, and or credit reporting bureaus. (*Id*. at ¶ 69.)

82. Each of the debtors in the Similar Cases, in the year prior to filing for bankruptcy, was represented by Mr. McAvity, in his capacity as a partner with UpRight Law, in a prepetition lawsuit filed in the District Court for the Western District of Washington pursuant to the FDCPA. (*Id*. at ¶ 70.)

83. Each of the debtors in the Similar Cases had entered into a bankruptcy retainer agreement with UpRight Law at the time he/she filed a lawsuit under the FDCPA. (*Id*. at ¶ 71.)

84. Each of the debtors in the Similar Cases was contemplating bankruptcy at the time he/she initiated a lawsuit under the FDCPA. (Exs. P9, R14, R15, R16, R17.)

85. UpRight Law's bankruptcy representation of the debtors in the Similar Cases formed the basis of a claim in their FDCPA lawsuits. Specifically, each of the FDCPA complaints that UpRight Law filed for the Similar Case debtors included a count alleging that the defendant collection agencies violated the FDCPA by continuing to contact the debtors after they had advised the collection agencies that UpRight Law represented them with respect to the debts the agencies were trying to collect. (Exs. R65, R66, R67, R68.)

86. Each of the debtors in the Similar Cases settled his/her FDCPA claim for monetary consideration prior to filing for bankruptcy. (Prehearing Order ¶ 72.)

87. UpRight Law received a portion of the settlement proceeds in each of the FDCPA lawsuits it filed for the debtors in the Similar Cases as payment for its attorney's fees and reimbursement of costs for UpRight Law's contingency fee representation in the FDCPA lawsuits. (*Id.* at ¶ 73.)

88. The Fosters, and each of the clients in the Similar Cases, reviewed and approved the petitions before Mr. Bellum filed them, although Mr. Keating testified he did not review his petition in its entirety. (Tr. 50:7-16; Dkt. No. 151, Admissible Evid. Stip. Ex. F – Stalter Dep. 11:13-15, 11:24-12:1; Ex. E – Mellott Dep. 11:6-10; Ex. C – Jones Dep. 18:5-16; Ex. D – Keating Dep. 9:3-20.)

89. Mr. Bellum obtained the handwritten signature for Sherri Mellott before he filed her petition in August 2016. (Tr. 150:17-21.)

90. With respect to the other three debtors in the Similar Cases (Ms. Jones, Ms. Stalter, and Mr. Keating), their petitions were filed before May 2016, which was before the CLE Mr. Bellum attended that resulted in him changing his practices and he presumably did not obtain their signatures on the petitions. (*Id.* at 150:22-25.)

91. Neither Mr. Bellum nor UpRight Law possesses Mr. Keating's, Ms. Stalter's, or Ms. Jones's original, "blue ink" signatures, or copies of their original, "blue ink" signatures, on the petition, schedules, and initial SOFA, or the chapter 7 statement of current monthly income, filed in their respective cases at ECF nos. 1 and 2. (Prehearing Order ¶ 90.)

92. Mr. Bellum testified that for each of the four clients at issue in the Similar Cases, at the time he filed each of their bankruptcies, he was not aware of their FDCPA settlements or lawsuits. (Tr. 151:18-25.) During the course of interviewing these clients, Mr. Bellum did not learn about their FDCPA lawsuits. (*See id.* at 155:9-15; 157:14-18; 46:3-12; Dkt. No. 151, Admissible Evid. Stip., Ex. C – Jones Dep 34:6-10; Ex. E – Mellott Dep. 40:16-23; Ex. F – Stalter Dep. 37:9-16.)

93. A draft of the petition, response to SOFA question number 16, and a Form 2030 filed in each of the Similar Cases was prepared by someone other than Mr. Bellum at UpRight Law. (Prehearing Order ¶ 81, 87; Tr. 211:8–17.)

94. Upright's Salesforce records for Ms. Mellott, Mr. Keating, and Ms. Jones included red flags and notations that the clients were involved in prepetition litigation. (Prehearing Order ¶¶ 74–76.) On November 10, 2015, UpRight Law's Chicago staff also alerted Mr. Bellum by email that Ms. Jones had a "potential FDCPA case." (*Id*. at ¶ 77.)

95. Mr. Bellum and UpRight Law did not disclose the existence of the FDCPA lawsuits or settlements in the schedules and SOFAs it prepared and filed on behalf of the debtors in the Similar Cases. (*Id*. at ¶ 79.)

96. Mr. Bellum and UpRight Law also did not disclose the compensation UpRight Law received in the prepetition FDCPA lawsuits in the initial schedules and statements it prepared and filed on behalf of the debtors in the Similar Cases. (*Id*. at ¶ 86.)

97. After the United States Trustee initiated this contested matter, Mr. Bellum filed amended SOFAs in the Similar Cases, disclosing the prepetition FDCPA lawsuits UpRight Law filed on behalf of the debtors in the Similar Cases, the full amount of the settlements of the FDCPA lawsuits, and the settlement proceeds received by the debtors. (*Id*. at ¶¶ 82–85.) Mr. Chern and Ryan Galloway, Associate General Counsel at UpRight Law, reviewed each of the amended SOFAs before Mr. Bellum filed the documents with the Court. (Tr. 111:18–20, 114:11–17, 116: 19–22, 124:24–25, 125:1–2.)

98. Mr. Bellum and UpRight Law have never disclosed, in the Similar Cases, the compensation UpRight Law received from representing the debtors in the Similar Cases in the prepetition FDCPA lawsuits-- on the initial Form 2030s, or otherwise. (Prehearing Order ¶ 89; Tr. 124:12–16, 125:7–13, 145:5–17.)

99. At the evidentiary hearing, Mr. Chern testified that he believed there was no obligation to report the FDCPA attorney fees on Form 2030 because "form 2030 asks for fees that were paid in connection with the representation of the client in the bankruptcy matter.  And representing a debtor in a

separate FDCPA claim, it was concluded, even before the bankruptcy case was filed. It's got no place on form 2030 at all." (*Id.* at 207:7-12).

100. The initial Form 2030s filed in *In re Foster* and the Similar Cases did not fully or accurately disclose the legal services excluded from the base fee in the Attorney Client Base Retainer Agreements for Chapter 7 Bankruptcy Related Services executed by the Fosters, Mr. Keating, Ms. Jones, Ms. Stalter, and Ms. Mellott. (Prehearing Order ¶ 88.)

101. UpRight Law decided that it need not disclose the fees it received in connection with the FDCPA cases on its clients' SOFAs. (Tr. 179:21–180:10.) According to Mr. Chern, this position is based on UpRight Law's belief that the fees came from the defendants in the FDCPA cases, rather than the debtors themselves, and was not the debtors' money. (*Id.* at 179:21–180:10; 188:18–22.)

102. At the evidentiary hearing, Mr. Chern testified that he "did not believe that [SOFA question] 17 was the place where you're supposed to be disclosing attorneys' fees that were paid by a collection agency as part of a settlement of an FDCPA case." (Tr. 206:7-17.) He thought that "[s]pecific preferences would be listed there, as well as payments to, say, a debt settlement program or some kind of debt resolution solution that the debtor had engaged in immediately prior to the bankruptcy case to notify the estate so if the estate wanted to try to recover payments into a debt settlement program, that that would be identified on that portion." (*Id.*)

103. Mr. Chern testified that it was UpRight Law that calculated its clients' portions of, and UpRight Law's attorney's fees from, funds that debt collectors paid to settle FDCPA lawsuits UpRight Law had filed for its clients. (*Id.* at 182:12–16.) He further testified that this calculation was based on the terms of the Consumer Rights Attorney/Client Agreement. (*Id.*)

104. From January 1, 2014, to December 31, 2016, UpRight Law filed 75 complaints on behalf of clients seeking relief under the FDCPA, and, within the year following the filing of the complaint,

represented the client in a bankruptcy case. (Prehearing Order ¶ 92.) During the same time, UpRight Law filed one FDCPA complaint on behalf of a debtor-plaintiff postpetition, while the client's bankruptcy case was pending. (*Id.*) UpRight Law filed 70 bankruptcy cases for these clients, some of whom had multiple FDCPA cases. (*Id.*)

105. At least 57 of the 76 FDCPA cases filed for its bankruptcy clients during that two-year period resulted in a settlement of the plaintiff's claims for monetary consideration. (*Id.* at ¶ 93.)

106. In 48 of the 70 bankruptcy cases in which UpRight Law had previously represented the debtor in a FDCPA lawsuit, or was preparing to file a FDCPA claim on behalf of the debtor, UpRight Law did not disclose the existence of the FDCPA lawsuit or potential lawsuit anywhere in the initial bankruptcy schedules or statements it prepared and filed on the debtors' behalves. (Ex. P36; Tr. 72:4–8.)

107. UpRight Law later made amendments to 11 of those 48 cases to disclose the FDCPA lawsuits. (*Id.* at 72:9-15).

108. UpRight Law was contractually entitled to attorneys' fees of $121,228.56 from its representation of the clients in the 57 known FDCPA cases that settled for monetary consideration. (Ex. P36; Tr. 76:10–12.) With the exception of one bankruptcy case, *In re Javinsky*, filed in the Middle District of Florida in February 2016, UpRight Law did not disclose on the SOFAs filed in the subsequent bankruptcies of the settling plaintiffs any compensation it had received or anticipated receiving from the FDCPA cases. (Tr. 74:20–25, 75:1–13, 77:13–19.) Similarly, UpRight Law did not disclose on the Form 2030s required by Federal Rule of Bankruptcy Procedure 2016(b) filed in the subsequent bankruptcies of the settling plaintiffs any compensation it received or anticipated receiving from the FDCPA cases. (*Id.* at 74:20–25, 75:1–13.)

109. UpRight Law and UpRight Litigation stopped taking on new FDCPA clients in May 2017. (Prehearing Order ¶ 94.) The entities stopped taking on new FDCPA clients in May 2017 because they

concluded it was not feasible economically to represent those clients. (Tr. 193:11-13.). The firm believed it could not generate enough income relative to the amount of work that was required to prosecute the cases for them to be profitable. (*See id.* at 193:18-20.) When asked whether UpRight Law might return to representing clients in consumer protection litigation at some point, Mr. Chern testified, "it's possible." (*Id.* at 178:5-7.)

110. Collectively, UpRight Law charged the Fosters and the debtors in the Similar Cases $7,850 in legal fees for their bankruptcies. (Ex. P9-1; Ex. P.17-1; Ex. P21-1; Ex. P.25-1; and P32- 1.) UpRight Law has refunded these bankruptcy attorneys' fees to the Debtors in the *Foster* Matter and the Similar Cases. (Prehearing Order ¶ 91.)

111. The Fosters and each of the debtors in the Similar Cases obtained discharges in their chapter 7 bankruptcy cases. (*See* Dkt. No. 24; *In re Stalter*, 3:16-bk-40099–MJH, Dkt. No. 9; *In re Mellott*, 3:16-bk-43236–MJH, Dkt. No. 9; *In re Keating*, 3:15-bk-45278–MJH, Dkt. No. 9; and *In re Jones*, 3:15-bk-45525–BDL, Dkt. No. 11.)

112. The U.S. Trustee advised each of the debtors in the Similar Cases that it had no interest in taking any action to modify their discharges, and had opened their bankruptcy cases solely for the sake of pursuing UpRight Law. (Dkt. No. 151, Admissible Evid. Stip., Ex. E – Mellott Dep. 5:11-15; Ex. F – Stalter Dep. 4:22-5:5; Ex. D – Keating Dep. 4:20 – 5:11; Ex. C – Jones at 4:23-5:8.)

## CONCLUSIONS OF LAW

FDCPA Fees and Statement of Financial Affairs

1. 11 U.S.C. § 526(a)(2) provides that a debt relief agency shall not "make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading."

2. 11 U.S.C. § 526(c)(5) provides that

> Notwithstanding any other provision of Federal law and in addition to any other remedy provided under Federal or State law, if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may— (A) enjoin the violation of such section; or (B) impose an appropriate civil penalty against such person.

3. UpRight Law and Mr. Bellum were required by SOFA question 5 and 9[6] to disclose respectively, "money collected from lawsuits" and all lawsuits in which the Fosters and debtors in the Similar Cases were parties in the year preceding their petition dates. UpRight Law and Mr. Bellum's omissions of FDCPA lawsuits on the SOFAs in those cases constitute untrue and misleading statements, and statements that upon the exercise of reasonable care, should have been known by UpRight Law and Mr. Bellum to be untrue and misleading, in violation of 11 U.S.C. § 526(a)(2).

4. UpRight Law and Mr. Bellum were required by the plain language of SOFA questions 16 and/or 17, and less clearly 18[7] to disclose the transfer of settlement proceeds from the FDCPA cases to

---

[6] SOFA question 5 queries,

> Did you receive any other income during this year or the two previous calendar years? Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefits; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings.

SOFA question 9 queries,

> Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding? List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

[7] SOFA question 16 queries,

> Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition? Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

SOFA question 17 queries,

UpRight Law. UpRight Law and Mr. Bellum's omissions of payments to UpRight Law of attorneys'

fees from the settlements of prepetition FDCPA lawsuits on SOFAs it prepared and filed in *In re Foster*

and the Similar Cases constitute untrue and misleading statements, and statements that upon the exercise

of reasonable care, should have been known by UpRight Law and Mr. Bellum to be untrue and

misleading, in violation of 11 U.S.C. § 526(a)(2).

5.      Similar to the U.S. Trustee's argument that UpRight Law and Mr. Bellum's omissions in

the SOFA violated § 526(a)(2), the U.S. Trustee also asserts that the omissions in the SOFA violated

Rule 9011(b) and § 707(b)(4). Rule 9011(b) and (c) provide, in relevant part,

> (b)  Representations to the court.  By presenting to the court (whether by
> signing, filing, submitting, or later advocating) a petition, pleading, written
> motion, or other paper, an attorney or unrepresented party is certifying that
> to the best of the person's knowledge, information, and belief, formed
> after an inquiry reasonable under the circumstances, -
> (3)  the allegations and other factual contentions have evidentiary support
> or, if specifically so identified, are likely to have evidentiary support after
> a reasonable opportunity for further investigation or discovery…
>
> (c)  Sanctions. If, after notice and a reasonable opportunity to respond, the
> court determines that subdivision (b) has been violated, the court may,
> subject to the conditions stated below, impose an appropriate sanction
> upon the attorneys, law firms, or parties that have violated subdivision (b)
> or are responsible for the violation.

---

> Within 1 year before you filed for bankruptcy, did you or anyone else
> acting on your behalf pay or transfer any property to anyone who
> promised to help you deal with your creditors or to make payments to your
> creditors?  Do not include any payment or transfer that you listed on
> line 16.

SOFA question 18 queries,

> Within 2 years before you filed for bankruptcy, did you sell, trade, or
> otherwise transfer any property to anyone, other than property transferred
> in the ordinary course of your business or financial affairs?  Include both
> outright transfers and transfers made as security (such as the granting of a
> security interest or mortgage on your property). Do not include gifts and
> transfers that you have already listed on this statement.

27

§ 707(b)(4)(B) and (D) provide, in relevant part,

> (B)  If the court finds that the attorney for the debtor violated Rule 9011 of the Federal Rules of Bankruptcy Procedure, the court, on its own initiative or on the motion of a party in interest, in accordance with such procedures, may order –
> (i)  the assessment of an appropriate civil penalty against the attorney for the debtor…
>
> (D)  The signature of an attorney on the petition shall constitute a certification that the attorney has no knowledge after an inquiry that the information in the schedules filed with such petition is incorrect.

6.  UpRight Law and Mr. Bellum should have made further inquiry into the factual contentions in the SOFAs in *In re Foster* and the Similar Cases, and the omissions of the FDCPA lawsuit constitute a violation of Rule 9011(b). Because I find the omissions in the SOFAs violate Rule 9011(b), they inherently violate § 707(b)(4)(B).  Similarly, UpRight Law and Mr. Bellum violated § 707(b)(4)(D) because upon further inquiry, Mr. Bellum should have known the information in the schedules to be incorrect.

FDCPA Fees and Form 2030

7.  11 U.S.C. § 329(a) provides that "[a]ny attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation."

8. Courts broadly apply a subjective test to determine whether fee payments were made "in contemplation of" bankruptcy.  *In re Perrine*, 369 B.R. 571, 581 (Bankr. C.D. Cal. 2007) (citing cases). The inquiry is "whether the debtor was influenced by the possibility or imminence of a bankruptcy proceeding in making the transfer." Id. (citing *In re Zepecki*, 258 B.R. 719, 724 (8th Cir. BAP 2001),

28

*aff'd*, 277 F3d 1041 (8ᵗʰ Cir. 2002). Here, the Fosters had already engaged Upright Law to prepare a bankruptcy filing and a creditor whose debt was potentially to be included in the bankruptcy was putting pressure on them. The Fosters were influenced by the imminence of bankruptcy even if the transfer was not a necessary step for the bankruptcy. Even fees related to avoiding bankruptcy may be in contemplation of bankruptcy let alone fees connected with preventing abuse by a creditor contemplated to have its debt discharged in bankruptcy. *See In re Perrine*, 369 B.R. 571, 581 (Bankr. C.D. Cal. 2007). The Fosters retained UpRight Law first and foremost as bankruptcy counsel. Retention of UpRight Law for FDCPA representation would not have occurred but for the bankruptcy representation, and the FDCPA representation involved one of various creditors creating pressure that motivated the bankruptcy. Additionally, the Retainer Agreement specifically authorized not only preparation of a bankruptcy petition and schedules but also investigation of violations of consumer protection statutes. The imminent bankruptcy filing in this context was surely in the Fosters' contemplation. The "in contemplation of" test has therefore been satisfied.

9. The "in connection with" prong involves an objective test that looks to a causal connection or impact on the bankruptcy from the work performed by the attorney in the non-bankruptcy matter. *See Wasserman v. Bressman* (*In re Bressman*), 327 F.3d 229, 241 (3d Cir. 2003). See also, In re *Gorski*, 519 B.R. 67 (Bankr. S.D.N.Y. 2014). The settlement obtained in the FDCPA action did not assist in payment for the Foster's bankruptcy case and did not have an impact on the bankruptcy. The U.S. Trustee has failed to show that the "in connection with" prong has been satisfied.[8]

10. Payment of attorneys' fees from the Fosters' FDCPA settlement to UpRight Law was compensation for services rendered in contemplation of their bankruptcy case even if not shown to be in connection with their bankruptcy case. However, as Sec. 329 and Rule 2016(b) is worded in the

---

[8] The "in connection with" prong may well have been satisfied in other UpRight Law cases if the FDCPA representations impacted the bankruptcies.

disjunctive, satisfaction of the subjective "in contemplation of" prong is sufficient. The FDCPA related fees should have been disclosed in the Rule 2016(b) Statement.

11. The FDCPA case related fees collected by UpRight Law for its clients in the Similar Cases would for the same reasons be transfers "in contemplation of bankrutpcy." Both 11 U.S.C. § 329(a) and Federal Rule of Bankruptcy Procedure 2016(b)[9] required UpRight Law and Mr. Bellum to disclose on the statements of compensation they filed with the court, in *In re Foster* and the Similar Cases, the attorneys' fees UpRight Law received, or expected to receive, from the FDCPA settlements.

12. UpRight Law and Mr. Bellum's omissions of the attorneys' fees received from the FDCPA settlement from the Form 2030s constitute untrue and misleading statements in violation of 11 U.S.C. § 526(a)(2).

Form 2030 and Scope of Services

13. UpRight Law and Mr. Bellum also violated 11 U.S.C. § 526(a)(2) by filing Form 2030s for the Fosters and debtors in the Similar Cases which did not accurately disclose the scope of services excluded from UpRight Law's base fee in the legal services agreement.

Sanctions and Injunctive Relief

14. With respect to UpRight Law's filing of SOFAs which failed to disclose prepetition FDCPA litigation, I decline to impose a civil penalty under § 526(c)(5). Although the Initial SOFA in *In re*

---

[9] Federal Rule of Bankruptcy Procedure 2016(b) provides that

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

*Foster* and the original SOFAs in the Similar Cases did not make these disclosures, the evidence did not demonstrate that these omissions were deliberate or intended to conceal the lawsuits or the settlements or had any material impact on administration of the cases. Moreover, Upright appears to have taken steps to avoid similar SOFA inaccuracies for future cases. Sanctions for future SOFA inaccuracies may certainly be imposed if UpRight's corrective actions fail.

15. With respect to the filing of SOFAS which failed to disclose the compensation that UpRight Law received from representation in pre-petition FDCPA lawsuits. I also decline to impose a civil penalty under 11 U.S.C. § 526(c)(5). The firm's *bankruptcy* fees in the Foster case were disclosed in response to Question No. 16. The FDCPA fee should have been disclosed in answer to SOFA Question 16 as it was a transfer on behalf of the debtors to a party, UpRight Law, which the debtors consulted about bankruptcy. Alternatively, the fees, even if not paid by the creditor, were transfers indirectly from the debtors to a party "who promised to help deal with" the Fosters' creditors.

16. For the same reason I do not impose sanctions under § 526(c)(5), I do not impose sanctions under Rule 9011(c) or civil penalties under § 707(b)(4).

17. With respect to filing Form 2030s which failed to disclose all compensation for services rendered in contemplation of or in connection with the bankruptcy cases, I similarly decline to impose a civil penalty under § 526(c)(5). Although I concluded that the Foster and Similar Case FDCPA fees were in contemplation of bankruptcy, the matter is a close question and was subject to good faith dispute by UpRight Law.

18. With respect to filing Form 2030s which failed to disclose excluded services listed in the legal services agreement, no further sanction is warranted. Judge Lynch previously addressed this issue in *In re Vanderhoof*, *In re Owen*, and *In re Perlee*, and in response, Mr. Bellum filed amended Form 2030s in each of his open cases to accurately disclose the services excluded from the base fee. UpRight

Law has already disgorged the fees associated with the bankruptcy case of the Fosters and the debtors in the Similar Cases, and I decline to impose sanctions, civil penalties, or additional disgorgement beyond the voluntary disgorgement which has already occured.

LBR 5005-1(d) Violations

19. LBR 5005-1(d)(2) provides that:

> Pleadings, affidavits, and other documents that must contain original signatures or that require verification under Fed. R. Bankr. P. 1008 or an unsworn declaration as provided in 28 U.S.C. § 1746, shall be filed electronically. The original signed document, in hard copy or electronic form, shall be maintained by the attorney of record or the party originating the document for a period not less than 5 years. Upon request, the original document must be provided to other parties or the court for review. The pleading or other document electronically filed shall indicate a signature; e.g., "/s/."

20. I conclude that LBR 5005-1(d)(2) is not ambiguous and that there is no reaonsable way of interpreting it to not require obtaining and retaining original, handwritten, "blue ink" signatures for a period of at least five years. Although Upright Law argues to the contrary, in context, "original signed document" could not mean the document marked "/s/" to indicate signature. Retention of such document, already filed with the court, would be pointless.

21. Although Mr. Bellum was unable to locate the document, I find that Mr. Bellum obtained an original "blue ink" signature from the Fosters on the original bankruptcy petition. Mr. Bellum testified that he remembered requesting original signatures, and Ms. Foster testified that she recalled mailing the schedules with the original signatures back to Mr. Bellum. However, Mr. Bellum admittedly did not obtain original signatures from the Fosters on numerous other documents he filed in their case. Mr. Bellum also admittedly failed to obtain original signatures on numerous documents he filed in various other bankruptcy cases, and neither Mr. Bellum nor UpRight Law possess "blue ink signatures" in the case of Mr. Keating, Ms. Jones, and Ms. Stalter.

22. I conclude that UpRight Law and Mr. Bellum violated LBR 5005-1(d)(2) by filing with the court schedules, and SOFAs on which Mr. Bellum and UpRight Law had placed debtors' electronic signatures even though the debtors had not provided original "blue ink" signatures for those documents and by not maintaining original signatures.

23. Mr. Bellum has engaged in a pattern prior to May, 2016 of filing bankruptcy documents bearing debtors' electronic signatures even though the debtors had not provided original "blue ink" signatures for those documents. He subsequently corrected this practice but in the Fosters' case, failed to retain original signatures for the petition and thirteen other documents. The U.S. Trustee asserts that pursuant to inherent authority, sanctions should be imposed against UpRight Law and Mr. Bellum for their failure to comply with LBR 5005-1(d)(2). Under a court's inherent sanctioning authority, a court must make an explicit finding of bad faith or willful misconduct. *In re Lehtinen*, 564 F.3d 1052, 1058 (9th Cir. 2009) (citing *Fink v. Gomez*, 239 F.3d 989, 992-93 (9th Cir. 2001). Bad faith or willful misconduct consists of something more egregious than mere negligence or recklessness. *Id*. Here, I find bad faith does not exist because the evidence does not demonstrate that these oversights were deliberate or had any material impact on administration of the cases especially given evidence that the Fosters and debtors in the Similar Cases authorized the court submissions in question. As the U.S. Trustee indicates, some courts have enforced sanctions, absent a finding a bad faith, where there is a local rule permitting sanctions. *See In re Singh*, 2014 WL 842102 (B.A.P. 9th Cir. March 4, 2014). To the extent I am not required to find bad faith to impose sanctions under a local rule, I still decline to impose sanctions here as I find that UpRight Law and Mr. Bellum have taken corrective measures and the misconduct is unlikely to repeat itself again.

24. I deny the Trustee's request for an injunction pursuant to 11 U.S.C. § 526(c)(5)(A) to require Mr. Bellum and Upright Law to comply with LBR 5005-1(d)(2) in all future cases. Under Fed. R. Civ.

P. 65(d)(1)(C), every injunction must "describe in reasonable detail – and not by referring to the complaint or other document – the act or acts restrained or required." The purpose of Rule 65(d) is to prevent confusion on the part of those faced with injunctive orders, and to avoid a decree too vague to be understood. *See Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1263 (9th Cir. 1989) (holding that an injunction that enjoins "future violations" of a statute fails to specify the precise conduct prohibited); *see also Parsons v. Ryan*, 754 F.3d 657, 689 n. 35 (9th Cir. 2014) (requiring that an injunction be "more specific than a bare injunction to follow the law.") The U.S. Trustee's request to enjoin Mr. Bellum and Upright Law from all future violations of LBR 5005-1(d)(2) is impermissibly vague. To the extent the requested injunction would simply require UpRight Law and Mr. Bellum to follow the local rule, it is unwarranted.

25. The Fosters and the debtors in the Similar Cases reviewed and authorized electronic signatures on their filings. In fact, Ms. Mellott did provide handwritten signatures prior to her initial filings. Additionally, the U.S. Trustee has not established the need for an injunction. The evidence established that UpRight Law did require its partners to obtain handwritten signatures at all relevant times, and that it introduced a signature audit policy in May 2017 to ensure compliance with that firm policy. Further, the evidence established that as of December 2017, UpRight Law had filed 367 cases in the Western District of Washington, but the U.S. Trustee provided evidence of only three cases in which Mr. Bellum had not requested handwritten signatures in advance of filing petitions. The evidence also established that Mr. Bellum modified his procedures following his attendance of a Continuing Legal Education Program in May 2016.

Summary

Although I find that UpRight Law and Mr. Bellum violated 11 U.S.C. §§ 526 and 707(b)(4), Rule 9011(b), and LBR 5005-1(d), I decline to impose sanctions, further disgorgement, a civil penalty

34

or injunctive relief for the reasons stated above.[10]  UpRight Law should submit a form of order

denying the motion.

/// **END OF ORDER** ///

---

[10]   The facts found regarding UpRight Law in the Virginia and Louisiana bankruptcy actions referenced at Docket No. 168 may well explain the United States Trustee's investment of effort in the present matter, however, the egregious behavior of Upright Law addressed in those opinions is in stark contrast to the level of problematic behavior found in this case.